May it please the court. Good morning, Your Honors. My name is Erin McGowan. I represent the appellant Dawain Wallace, a City of St. Louis police officer. Appellant Wallace appeals the district court's denial of his summary judgment motion based on qualified immunity. In this case, the appellee, Kevin Chestnut, claims that Officer Wallace violated his Fourth Amendment rights by stopping him in Tower Grove Park in February of 2015, searching him and handcuffing him briefly after he was observed shadowing a female police officer who was conducting traffic stops. Counsel, could I ask you a couple of factual questions first before we get rolling here? What's the state of the record with respect to what Officer who was who was on duty and was being observed? What exactly was told to him? Do we know that? Yes, Officer Wallace knew that Officer LaVia Graham, the officer who was conducting the traffic stops and had observed Mr. Chestnut following her, had reported to dispatch that she had a suspicious person following her to all of her car stops and that he was currently across the street from her in a shadowy area of the park. So when Officer Wallace arrived at the scene, did he inquire of the officer who was present or did he go directly to Mr. Chestnut? When Officer Wallace arrived on the scene, he observed a man matching the description given by Officer LaVia Graham leaning against a tree in a tree-lined area of the park. At that point, it was dusk and he shone his spotlight on the man leaning against the tree and was able to identify him as the man that Officer Graham had reported to be following her. But did he have a conversation with Officer Graham? He did not. Okay. So I assume this is in, you know, it's in a record and there doesn't seem to be any I assume that Officer Wallace could reasonably rely on what the dispatcher told him that the other officer had told the dispatcher in approaching Mr. Chestnut and doing what he did. I didn't see that argument advanced to any significant degree in the briefs. You are correct in that that argument was not addressed to a significant extent in the this case. It seems to me, I'm not saying this is this case, but it seems to me if the facts were that to put the best spin on them from your standpoint, that what all Officer Wallace knew was that somebody was, let's say, stalking a police officer. I know that word was not assuming that the person was some substantial risk and might justify the cuffing and the frisking independently of anything else. I realize that what this case comes to us, not on that ground, but it does seem to me that somehow it's relevant to this case that what Officer Wallace actually was reasonably entitled to believe. I think there are cases that say that officers are reasonably entitled to believe what it is dispatchers tell them, especially if it's kind of an emergent situation. Correct Your Honor. This is not a case where Officer Wallace was relying on an anonymous tip. He relied on information relayed over the dispatch system by another officer. He arrived on the scene. The information the officer described to the dispatcher, he observed someone matching the description of the person. Appellant Wallace's argument and the grounds for his appeal is that the district court erred in denying him qualified immunity because it was not clearly established law on February 1st. It's a case in which an investigator is stopped and briefly handcuffing that suspect after they've been seen shadowing a female police officer from stop to stop, after they've stationed themselves in a grassy tree-lined area after dusk to watch her, and this is occurring in an area that had been known for violence directed against police in the months prior, and also fails to cooperate with the investigating officer's investigation by providing full security number. To sort of round out the facts that have already been presented to the court, at the time Officer Graham called for an assist because she had observed a man following her from stop to stop. She was conducting traffic enforcement in a vehicle, clearly marked traffic enforcement, and when Officer Wallace arrived on the scene, he saw the man who matched the description. This is how Officer Wallace describes it. He was lurking by a tree in a dark area. He had to turn on his car's spotlight to illuminate the area where the man was standing. This was a winter, cold winter evening. The sun had set at this point. He approached the man. He asked him for identification. The man, later identified, of course, as Appellee Mr. Chestnut, did not have identification on him that evening. He asked Mr. Chestnut to then provide his name, I believe date of birth, and social security number. He was given name, date of birth, I believe also an address. Mr. Chestnut just refused to provide his full social security number. He said he didn't understand why that was pertinent to the situation. Now, Officer Wallace, because he wasn't presented with a state ID, needed that social security number to run a search of the regional justice information system. He wanted to ensure that this man didn't have any warrants or wanteds, didn't have a prior criminal history. Couldn't he have done it without social security number, date of birth, and name? Wouldn't that pull up at least someone on Regis? Officer Wallace testified that he did not believe that he could do a complete Regis search without the full social security number. He said that he was concerned that he'd pull up the wrong Kevin Chestnut. He thought that could be a common name. He said he needed the full social to ensure that he was looking at the right Kevin Chestnut. Even with the address and date of birth? I think his testimony, he simply said, I need the social security number. I don't know necessarily the age of the person I'm looking at. I can be 100% sure I have the right Kevin Chestnut if I have the social security number. Officer Wallace did believe that that was a necessary piece of information. Mr. Chestnut was, at that point in time, handcuffed. Was it determined whether or not he had a weapon before he was handcuffed or after? It was determined that he did not have a weapon, I believe, before he was handcuffed. The record viewed in the light most favorable to Mr. Chestnut was that he was asked for his ID and everything was happening around the same time that Officer Wallace was patting him down, frisking him around the time he was asking for the social security number. And Mr. Chestnut was objecting to giving the social security number. So what justifies the handcuffing once you've determined that he's not carrying a weapon? It is not clearly, the law does not require that Mr. Chestnut be armed to be placed in handcuffs. Handcuffing during a lawful terry stop is permissible to either, for officer safety and to maintain the status quo. So here, Officer Wallace was dealing with a individual who's been shadowing a female officer under very unusual circumstances. He stationed himself in a dark area of the park. Officer Wallace testified- Counsel, what do you mean by stationed? I think the record shows that he was leaning against a tree in plain sight, wearing a yellow shirt. He was leaning against a tree. Both Officer Wallace and Officer LaVia Graham testified that he was in a darker, shadowy area of the park. It had grown dark. He wasn't on a walking path. He wasn't on a jogging path. He was in this tree-lined area, leaning against a tree. He was visible, of course, when the spotlight was shined on him. But he did seem like he was trying to conceal himself, based on both officers' testimony. Their observation was he's trying to conceal himself. He's in that spot for a reason. Officer Wallace testified that he's been an officer for 13 years. He understands citizens' curiosity to watch police activity. He says he wholeheartedly understands that. But typically, in his experience, when citizens are curious and want to watch police activity, they do so out in the open. It was very strange to him, and he did not understand why this individual had put themselves in this dark, tree-lined area to watch Officer Graham conduct her stops. His testimony was that when he arrived, Mr. Chestnut appeared to be lurking around a tree. Next, Mr. Chestnut refuses to provide his full social security number. And again, in Officer Wallace's experience, 13 years of experience at that point, when someone is unable to provide ID and then their full identifying information, he becomes, it's a red flag to Officer Wallace. He becomes concerned. Is this individual lying to me about their identity? Do they have a warrant? Do they have a wanted out? Why won't they provide me with their full identifying information? Officer Wallace is entitled to rely on the totality of the circumstances. He has a person who's been shadowing a female officer from stop to stop at dusk. This is an area that had seen protest activity in late 2014, significant property damage, and at times violence directed at police officers. Officer Graham reported that she was aware that officers had been spat upon, had things thrown at them. And then coupled with Mr. Chestnut's refusal to give his full identification, Officer Wallace was justified in believing that he could potentially be being evasive. And he was concerned for his safety. He was concerned for Officer Graham's safety. The Supreme Court has held that certainly evasiveness is a factor that can justify reasonable suspicion. And handcuffing is permissible during a terrorist stop. This court has said repeatedly that handcuffing simply requires some reasonable belief that the suspect is armed or dangerous or that the restraints are necessary for some other legitimate purpose. In this case, the other legitimate purpose would certainly be getting a correct identification of Mr. Chestnut. In fact, the Supreme Court has said that getting a correct identification is, of course, the government has a legitimate interest in correctly identifying the person they're dealing with. He was curious, could this person be wanted on another offense? Does he have a record of violence? Does he have a mental illness? Once he was able to conduct the regis search, he was able to rule these things out. Confirming Mr. Chestnut's identity ultimately- Can a police officer extend the period of a terrorist stop for the purpose of finding out if the person who's subject to the stop has any warrants? Yes. That are active? Yes, and actually just recently in 2017 in the case United States versus Murillo Salgado. That was a traffic stop case and this court held that the officer is entitled to complete the routine but time consuming task of running the person's identification through a computer system to check their criminal history. That's certainly a legitimate reason that the terrorist stop could be lengthened. And here, viewing the record in the light most favorable to Mr. Chestnut, he was stopped for 20 minutes. 20 minutes is not, well the Supreme Court has held in sharp that 20 minutes is not too long of a detention to convert a terrorist stop into a de facto arrest. But in order for the plaintiff to show that this became a de facto arrest, which it did not, you'd have to show that the officers delayed things more than reasonably necessary. Here, Mr. Chestnut- It doesn't depend on whether he had reason to believe that Mr. Chestnut needed to be restrained with handcuffs after he determined there was no weapon? Yes, sir. Why was he not under arrest after he was handcuffed? He was arrested, he was, this was not a de facto arrest because there were legitimate reasons for the handcuffing. He'd been seen following a female officer from stop to stop that raised suspicion. That was a huge red flag for Officer Wallace that Mr. Chestnut could be capable of, potential threat to him or miss. Doesn't he have to articulate something more specific than that? Well, he, the fact that Mr. Chestnut followed Officer Graham from stop to stop, that in itself, it's not a hunch. He, that is a fact, that is the articulable fact. And then he arrives on the scene and he doesn't quite understand why this individual is watching him from a tree-lined area rather than out in the open, which has been his experience that citizens will watch out in the open. That doesn't seem to apply to the frisking, but what about the handcuffing? He was concerned that Mr. Chestnut could be dangerous based on- Based on what? Based on the information that was conveyed to him over the dispatch. The following behavior. That is unusual behavior in Mr. Wallace's experience. He could have been a person with a criminal history, a violent criminal history. He could have had violent sexual offenses. At that point in time, Officer Wallace did not know. Now you're focusing on what I was talking about in the beginning and that is what he knew from the dispatcher rather than focusing on what his testimony was with respect to what he saw when he got there. Those are two different possible justifications for his activity, right? Yes, and I see that my time is run, but if I may address your question. Of course. He reasonably relied on both. He relied on the information given to him by the dispatch and he relied on his own common sense conclusions about human behavior when he arrived at the scene that it was, he could not explain, it was ambiguous why the citizen was leaning against the tree to watch this routine car stop on a cold winter night at dark. Thank you. Thank you for your time, Your Honors. Good morning, Your Honors, Counsel. My name is Bob Herman and I represent Mr. I'm going to start with the facts, not the spin. The facts are as set forth in page 15 of my brief. It relates the testimony of Wallace in deposition. When Wallace was asked directly in deposition, when you arrived, did you suspect chestnut of any crime? The answer is no. That's the end of the case. That's the end of their case. No suspicion of crime. When were there any facts? What if the, some might say that his subjective belief isn't really all that relevant. The question is whether an officer armed with these facts could have, as an objective matter, believe that a crime was committed. Well, as Judge Grunder has pointed out a number of times, since Judge, you've written many times on this issue. You have to have a specific articulable belief that the person, the particular person, is committing a particular crime. Why wouldn't this report from the dispatcher give Officer Wallace that articulable suspicion? Well, as Judge Grunder has said in U.S. for the court says, we find it remarkable that nowhere in the district court record did the government identify what criminal activity they were suspecting. Where is that? Where is the criminal activity that they were suspecting? Were they suspecting him of terrorism, of assault? Does he have to have suspicion that a crime has occurred? Or is it sufficient under Terry that criminal activity is afoot? Afoot, which means either has occurred or is in the process of occurring. Or arguably being planned. That there's a crime. It has to be an identifiable crime, not just I'm suspicious. See, I think the major flaw in the city's argument in this case is that they are talking broadly about suspicious behavior. But suspicious behavior is only part of the test. The actual test is suspicious and articulable suspicion that a crime is being committed or has been committed or is about to be committed by a specific particular person. They don't have that in this case. Is about the only thing that might work here. Sorry? Is about to be committed, but be the only thing that would work here. And about to be committed, if that works here, what is the crime that's about to be committed? They can't identify any crime because there was no such crime and there was no such belief that a crime was about to be committed. And there's no real evidence that he had the information that the officer- Well, there was a high crime area and following policemen around might give rise to suspicion that somebody has some- No, sir. Ill intent. No, sir. Being in a, well, it's not a high crime area. There's no facts. Well, there was evidence that- No, there's no evidence that it was a high crime area. There was evidence that there were protests in the area. That's all. We're not talking about, we're talking about Tower Grove Park, which there's no evidence that this particular area is a high crime area. And no one has identified it as a high crime area. And no one has identified that he was doing anything other than standing there within a couple of feet of the jogging path, which is why he was in the park to begin with. He was there jogging. He was wearing jogging clothes, and that's why he didn't have his driver's license with him. He identified himself. In fact, he gave him a name, he gave him a date of birth, he gave him an address. The only thing that they're complaining about is, and this is not something that any officer on the scene complained about as a basis for arrest or as a basis for a carry stop. But the failure to identify Social Security is not the basis for a crime. It's not a crime to fail to give your Social Security number. In fact, the 5USC Section 552A prohibits a government demanding your Social Security number for any reason. Unless they comply with certain procedures, which is, the procedures are basically, they have to tell you why they're demanding it, and they have to give you reason to, give you ability to say no, and then some procedures after that. So that can't be used, the fact that somebody, a police officer walks up to you and says, give me your Social Security number, and you refuse. That's not the basis for arresting them, or for believing that a crime is committed. Counselor, let me clarify one thing. I saw on the record that Mr. Chestnut gave his name in the last four digits of his Social Security number. Is it also in the record that he gave his address? I believe that he did, but I can't be sure at this moment. I'm sorry, I didn't hear the question. Whether he gave his address. Oh. I think he gave some, he gave more than just the name. I believe he gave his phone number, I believe he gave his address, but I don't want to rely on that. I'd have to go back and search the record for that, Judge. But his name certainly is enough. And once we get, once we get further into this, the. So let's go back to the circumstances that he faced and the information he had when he got there. Why wouldn't it be reasonable for the officer to want to investigate to make sure that there's not a planned attack on another police officer? Well, he can, and he did, but he did by saying. That's just the opposite of what you said a minute ago. No, I'm going to cite, I'm looking for one of your cases, Judge. That's the worst. He did by saying, hey, who are you? What are you doing here? My name is Kevin Chestnut, I stopped here to watch this traffic. That would be the end of it. That's a less invasive, I'm looking for, here, I'm looking for one of your cases, Judge. Well, wait a minute, wait, let's just talk about the facts here. Okay. He then, if it's reasonable for him to want to investigate to make sure that this fellow officer is not about to be assaulted, can you dispel that by simply asking the person's name? You can dispel it by looking at all of the circumstances, because what is the evidence that a man standing across the street, more than 40 feet away from a police officer, is about to assault the police officer? Well, there's more to it. They moved from place to place. He was, well, he was moving place to place along the road. At one time, where he just happened to be standing there, this had been occurring over a period of time, a series of traffic stops. Two traffic stops. The evidence is that he was jogging along the path, along the road. There's a path that, on the edge of the park. Well, that's his story. Well, it's his story, but all facts on summary judgment get caught. I understand, but I'm going back on my dispatcher point. The dispatcher didn't say he was jogging along the road. Those were not facts that the officer knew, and the question here is what a reasonable officer, based on his knowledge of the situation, could have done. What your man said he was doing may be true, but the question here is what did this officer know? Okay, so you're asking me what should he have done? I'm sorry? Well, you're asking me what the officer should have done. Walk up to the scene. Sir, what are you doing here? What's your name? Kevin Chestnut. What are you doing here? I'm jogging on the park. Well, move along, would you? That would have been sufficient. That is, there is no reason to believe that anything further is necessary, so long as he would comply with the reasonable order of the police. If Officer Wallace had said, okay, look, nothing to see here. Go move along. I don't want anybody to think you're involved in anything here. And if he didn't move, then maybe he would have an opportunity to go further with that investigation. But as the court has pointed out before, and Judge Grunder in particular, there are reasons why people stop and watch traffic stops. It's not unusual. If you see a traffic stop and you happen to be out, you would watch it. That's not in and of itself a reason to believe, a specific and articulable reason to believe that a crime has taken place. And that is not also, the facts that I didn't get to yet here are, he had no reason to believe that he was armed or dangerous. So there's no reason for the frisk. There's no reason for the Terry stop. There's no reason for the frisk. There's no reason for the handcuffs. And this whole thing could have been ended right at the very outset of it. Well, let me, let me go back to my first question then. Because I thought, I thought you sort of conceded that to me, but maybe not. No, no, I didn't concede. Knowing what he knew at the time, was it reasonable for him to, to think that perhaps there was an assault being planned on, on the other officer? No, sir. Okay, why not? It was not, I didn't concede that. What I conceded was it might be reasonable for him to approach and say, what's going on here? What are you doing? And to have a, and then you wouldn't implicate any fourth amendment concerns because questioning on, in a public place is not a fourth amendment concern. So he could have walked up to Mr. Chestnut and said, hey, why are you standing here? Counsel, I don't know that we have to speculate. Don't we have testimony from officer Wallace where he said what his reasons were. And I'm paraphrasing, but not knowing what a person is doing or could be doing or have the capability to do, that that was what he was concerned. That's what he said, but that is actually not knowing what he is capable of or what he is going to do is the complete opposite of, I have a reasonable and articulable suspicion that a crime is being committed and that this person is involved in that crime. To say, I don't know what he was doing there. And that's why I slapped the cuffs on him to find out what he was doing. That is not the same as saying, I have a reasonable, articulable and specific belief that he, that this person was, was involved in a specific crime at the time of the approach. So he jumped the gun. He just came up and slapped the cuffs on him. And then this whole idea about a simple, a brief Terry stop, 20 minutes is not a brief Terry stop. They extended it. And if you look at Rodriguez just two years ago, you can't extend a Terry stop just waiting for the dogs to show up. What was the reason that it took 20 minutes here? They don't, they haven't identified any such reason. They were doing was they said, didn't your client supervisor to show up? Because your client asked to talk to supervisor. Well, that didn't need to keep in handcuffs the whole time for that to occur. So isn't at least part of the delay attributable to him? No, I don't believe so. I think to say for an offer for somebody who's being mistreated, which is what Mr. Chestnut thought he was being treated. For him to say, I want to talk to your supervisor is a reasonable response to that. It doesn't mean keep me here in handcuffs for 20 minutes while the supervisor shows up. I'm under arrest. Why am I under arrest? That's that is unreasonable in this circumstance. In any of the circumstances that are set forth in this case, it's unreasonable to believe that there was any necessity for a Terry stop because they had no reason to believe he was armed and dangerous. They had no reason to pat him down. They had no reason to search him. And they certainly had no reason to handcuff him. And then they had no reason once the, once they determined that, once it was determined that Mr. Chestnut was not armed and dangerous, they had no reason to keep him in handcuffs for 20 minutes. Counsel, we don't have to determine whether he was under arrest to decide this case. I think by all definitions of the word arrest, he was under arrest. A Terry stop is a form of arrest. It's a form of arrest that's allowable if it's brief and not any more intrusive than necessary to determine whether a person is armed and dangerous. This goes long, long beyond that. And this is a 20 minute, 20 minute of handcuffing, of standing there in a public street, being handcuffed, is certainly goes beyond any, any Terry stop or any incidental brief and unobtrusive invasion into his privacy. He's standing there for 20 minutes in full view, surrounded by police officers, handcuffed. That is an intrusion into his fourth amendment rights and the, this court, as well as the Supreme court has pointed out that, that such an intrusion is more than just a minor inconvenience of, of being a citizen in this country. It is an intrusion that violates the fourth amendment. And the argument that, that the city makes in this case, or that the, that the city makes on behalf of officer Wallace is essentially turns us, it turns our civilization, it turns our society into a garrison state. You don't have to respond to every order of a police officer. In fact, Judge Grender, you wrote, you wrote an opinion about the person who the police officer demanded their ID and the person said, I'm not giving you an ID. I don't have to do that. And they arrested, they arrested him for failing to give an ID. And you said, why, why does he have to? There's not, it's not a crime to refuse to identify yourself. I thought Judge Loken wrote that case. Well, did he write that? No, he wrote the dissent on that. I think, I think you were part of the majority, but it says per curiam. So I assumed you wrote it because the writing was so good. Nice try. Mr. Herman, what's your best case that makes this clearly established violation? Oh, well, interestingly enough, you published a case. One of mine, right? Huh? One of mine. Well, no, in fact, it's not, but it cites to yours. So the Eighth Circuit published a case on August 30 of 2019, just less than a month ago. It's Lowry, L-O-W-R-Y. It doesn't, I don't even have an F-third citing for it yet. But it cites back to one of your cases, Judge, which is U.S. versus Jones from 2010, which has got a lot of great language. If I had a lot of time, I would. Well, if you think it's helpful, Mr. Herman, and it's new, why don't you submit it by virtue of a 28-J letter? I can. I will. Then if I could have just a moment. This verifies what we were talking about before. Being stopped and frisked on the street is a substantial invasion of an individual's interest to be free from arbitrary interference by police. And the police have less invasive options for identifying the perpetrators of crime. They could have initiated a consensual encounter, just like I've been saying, could have initiated a consensual encounter and said, hey, what are you doing here? What's your name? Go on. Move on. And that's the end of it. Mr. Herman, your time's up. Very good. Thank you, Judge. We'll take a look at it if you'll submit it on a 28-J letter. Very good. Ms. McGowan, you used up all your time, but I'll give you one minute if you have something you really want to respond to. Just briefly in response to Apelli's argument, Mr. Herman repeatedly asked, what crime was being committed? What crime was being committed? And insinuated that Officer Wallace could not identify a specific crime that he thought was about to occur or in progress. I think that is a misstatement of the law. There is no clearly established law that would have put Officer Wallace on notice that he needed to be able to articulate a specific crime he thought Mr. Chestnut was about to engage in. He knew that he was following Officer Graham. He was concerned that he was a danger to Officer Graham. There's no requirement. There's certainly no clearly established law that he needs to identify a specific crime. He needs to be aware that his behavior or conduct is unlawful before he's subject to suit. The plaintiff needs to identify a bright line that Officer Wallace transgressed. It's the Apelli's burden to identify the clearly established law. They have not done so here. Thank you very much for your time. Thank you, counsel. We appreciate your arguments. The case will be submitted and decided in due course.